IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

GUSTAVO SOTO and THOMAS W.    )
FURLONG, JR.,                 )
                              )
                              )
Individually and on behalf of all others    )
similarly situated others     )
                              )
                              )
        Plaintiffs,           )
                              )
-vs-                          )        Case Number:  3:14-CV-01287-MJR-PMF
                              )
AAMCO TRANSMISSIONS, INC.,    )
(Serve: Registered Agent      )        JURY TRIAL DEMANDED
        201 Gibraltar Road    )
        Horsham, PA  19044)    )
                              )
And                           )
                              )
AMERICAN DRIVELINE SYSTEMS, INC)
(Serve: National Corporate Research, LTD  )
        615 S Dupont Highway  )
        Dover, DE  19901)      )
                              )
And                           )
                              )
AMERICAN DRIVELINE CENTERS, INC.)
(Serve: National Corporate Research, LTD  )
        615 S Dupont Highway  )
        Dover, DE  19901)      )
                              )
And                           )
                              )
BRET BERO,                    )
(Serve: 2 Bethesda Metro Center  )
        14th Floor             )
        Bethesda, MD  20814)   )
                              )
And                           )
                              )
MARC GRAHAM,                  )
(Serve: 201 Gibraltar Road    )

```
            Horsham, PA  19044)        )
                                        )
And                                     )
                                        )
MIKE SUMSKY,                            )
(Serve: 201 Gibraltar Road              )
            Horsham, PA  19044)        )
                                        )
And                                     )
                                        )
BRIAN O'DONNELL,                        )
(Serve: 201 Gibraltar Road              )
            Horsham, PA  19044)        )
                                        )
And                                     )
                                        )
TODD LEFF,                              )
(Serve: 200 Horizon Drive, Suite 203    )
            Hamilton, NJ  08691)       )
                                        )
And                                     )
                                        )
BRETT PONTON                            )
(Serve: 201 Gibraltar Road              )
            Horsham, PA  19044)        )
                                        )
And                                     )
                                        )
MOHAMMAD "MICHAEL" GANJEI               )
(Serve:  7316 Wisconsin Ave., Suite 420 )
             Bethesda, MD  20814).      )
                                        )
            Defendants.                  )
```

## **<u>COMPLAINT</u>**

COMES NOW, Thomas W. Furlong, Jr. and Gustavo Soto, individually and on behalf of a class of similarly situated others (hereinafter collectively referred to as "Plaintiffs"), by and through counsel, and for their causes of action against all Defendants, state and allege as follows based upon personal knowledge as to their own acts and as to all other allegations, upon information and belief and investigation by counsel:

<u>PARTIES</u>

1.      Plaintiff Thomas W. Furlong, Jr. is a citizen and resident of the State of Maryland.  That at all times relevant herein, Plaintiff owned and operated an AAMCO franchise.

2.      Plaintiff Gustavo Soto is a citizen and resident of the State of Colorado.  That at all times relevant herein, Plaintiff owned and operated an AAMCO franchise.

3.      Plaintiffs, collectively on behalf of themselves and others similarly situated, are, hereinafter, referred to as "FRANCHISEES."

4.      This is a class action that the above named Plaintiffs bring on behalf of themselves and on behalf of all others similarly situated in the United States of America who purchased an AAMCO franchise(s).

5.      Defendant AAMCO Transmissions, Inc., ("ATI"), is a Pennsylvania corporation, established on November 6, 1963, and maintains its principal place of business in Horsham, Pennsylvania.  ATI is the franchisor of a national network of automotive service centers.

6.      Defendant American Driveline Systems, Inc., ("ADS") is a corporation organized and existing under the laws of the State of Delaware; That ATI is a subsidiary of ADS; That, further, the majority owner of the shares of ADS is American Capital, LTD, as set forth below.

7.      Defendant American Driveline Centers, Inc., ("ADC") is a corporation organized and existing under the laws of the State of Pennsylvania; ADC is an affiliate of ATI and used for the purpose of owning corporate AAMCO centers; That ADC was previously known as Cottman Transmission Centers, Inc. until July of 2006, when an amendment was filed with the State of Pennsylvania.

8.      Defendant BRET BERO (hereafter referred to as "BERO") is, upon information and belief, a citizen and resident of the State of Massachusetts. Defendant BERO joined American Capital, Ltd. as a Vice President in May 2007 and was promoted to Principal in 2009. BERO has served as the interim CEO and COO of several American Capital portfolio companies including ADS and ATI.

9.      Defendant MARC GRAHAM, (hereafter referred to as "GRAHAM") is, upon information and belief, a citizen and resident of the State of California.  That at all time relevant herein, defendant GRAHAM was appointed President and CEO of AAMCO and American Driveline in September 2009. GRAHAM joined the Board of Directors of AAMCO in March 2006. In December 2011, GRAHAM was appointed Chairman of the Board of Directors of ADL and AAMCO.   Upon information and belief, in or about February of 2013, GRAHAM voluntarily resigned on or was asked to resign by the Board of Directors of ADL.

10.     Defendant MICHAEL SUMSKY, (hereafter referred to as "SUMSKY") is, upon information and belief, a citizen and resident of the State of Pennsylvania.  Defendant SUMSKY joined AAMCO in June 2006 as Vice President of Finance-CFO. SUMSKY serves as Secretary of AAMCO, ADL, and Cottman, positions he has held since September 2006.  In addition, SUMSKY serves as President of ATI's undisclosed subsidiary, ADC.

11.     Defendant BRIAN O'DONNELL (hereafter referred to as O'DONNELL) is, upon information and belief, a citizen and resident of the State of Pennsylvania. That at all time relevant herein, Defendant O'DONNELL served as Senior Vice President of Operations for AAMCO. O'DONNELL started with AAMCO in January 1985 as a Field Operations

Manager. From May 1988 until June 1992, O'DONNELL was Director of Operations. O'DONNELL became Vice President of Operations in June 1992 and continued in that position until 1997 when he was appointed Senior Vice President of Operations.

12. Defendant TODD LEFF (hereafter referred to as "LEFF) is, upon information and belief, a resident of the State of Pennsylvania. Defendant LEFF was President and CEO of AAMCO from March of 2006 until April of 2009 and led the merger of Cottman Transmissions and AAMCO.

13. Defendant BRETT PONTON (hereafter referred to as "PONTON") is, upon information and belief, a resident of the State of Pennsylvania.  Defendant PONTON is the current President and CEO of AAMCO and AMERICAN DRIVELINE.

14. Defendant MOHAMMAD "MICHAEL" GANJEI (hereinafter referred to as "GANJEI") is, upon information and belief, a resident of the State of Maryland.  Defendant is the current President of National AAMCO Dealers Association (hereinafter referred to as "NADA").  GANJEI has engaged in a pattern of interest which has resulted in his participation in the RICO enterprise.

15. In this complaint, the term "AAMCO" refers to the web of affiliated companies, corporations, limited liability companies, the franchisor, and their employees, representatives, and/or agents, that acting together or separately, control and/or manage and/or assist the business of the AAMCO franchise system.

16. In this complaint, the term "FRANCHISOR" refers to Defendant ATI.

17. In this complaint, Defendants GRAHAM, SUMSKY, O'DONNELL, BERO, LEFF, PONTON and GANJEI are hereinafter collectively referred to as "CORPORATE REPRESENTATIVES."

18.     Plaintiffs have further information and belief that more discovery in this complaint will
        lead to additional CORPORATE REPRESENTATIVES.

19.     All Defendants are associated with the RICO Enterprise alleged herein and conducted
        and participated in, directly and/or indirectly, the conduct of the RICO Enterprise's
        affairs.

## NATURE OF THE CASE:

20.     This is a class action brought by franchisees of the AAMCO franchise system
        (hereinafter referred to as "AAMCO") arising from the illegal business scheme of
        AAMCO and its web of affiliated entities and individuals who control and operate
        AAMCO (collectively, all the Defendants).  Through this scheme, Defendants
        fraudulently induced Plaintiffs and the Class to purchase a franchise and/or continue to
        operate their franchise, and thereafter exploited their control and economic power in
        order to extract exorbitant and unjustifiable payments and expenditures from their
        franchisees.  As a result, Defendants reap grossly inflated sales and profits, creating an
        illusion of corporate growth and business prosperity while causing substantial,
        permanent, irreparable financial harm to the franchisees.

21.     AAMCO's illegal scheme consists of three primary components.  First, AAMCO engages
        in a policy of fraudulently and deceptively inducing franchisees to purchase AAMCO
        franchises by intentionally misrepresenting the true nature of the contractual relationship
        as well as the financial prospects for the franchisee and their likelihood of success.
        Second, AAMCO further takes advantage of its franchisees through other illegal,
        deceptive and fraudulent means, including but not limited to its willful practice of: (a)
        teaching and encouraging franchisees to engage in fraudulent and deceptive business

practices in order to reap profits, (b) deceptively churning franchise locations between the franchisees, and (c) charging illegal, undisclosed, inflated fees/charges to the franchisees in order to reduce the franchisees' income and increase the Defendants' profits. Third, AAMCO conspires with GANJEI in order to misrepresent material information to franchisees and provide assurances to franchisees in order to mislead the health of the system. In exchange, GANJEI receives a financial benefit through arrangements with AAMCO and its preferred distributors.

22. When the inevitable failures of franchisees throughout the system come to pass, Plaintiffs lose their entire investment and business, and Defendants suffer no loss. Defendants step in and take control of the center through use of intimidation and threats of financial ruin. This is done in order to coerce and extort the franchisee by requiring them to sign their franchise over to the franchisor and execute a general release of claims.

23. Defendants also utilize "Floaters" to fraudulently inflate the numbers of the previously owned business through means which are questionable, to say the least. By inflating the numbers, Defendants are now able to churn the franchise and obtain additional, unwarranted franchise fees from the next unsuspecting victim.

24. The harm to the franchisee is obvious: complete financial devastation. Of the ATI franchisees that use SBA financing, at least 39% are in default. That is an astounding figure and further evidence of the failure of the system.

25. Plaintiffs bring this action alleging violations of the Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. § 1962(c). Plaintiffs seek damages to remedy Defendants' unconscionable, fraudulent, and unlawful practices in connection with the operation of its franchise scheme.

<u>The Inception of AAMCO</u>

26.     Robert Morgan founded AAMCO in 1963 after identifying a need in the automotive

services industry and developing a business model specializing in repairing automatic

transmissions.

27.     Since its inception, AAMCO has been engaged in the sale of franchises to operate

AAMCO service centers that specialize in the repair of automotive transmissions.  Only

recently did AAMCO branch out to complete car care service.

28.     In 1992, Robert's son, Keith Morgan, took over the company as CEO.

29.     In 2005, Robert Morgan passed away.  The Morgan family sold the company in March of

2006 to American Driveline which already owned their then longtime rival Cottman

Transmission.

30.     Upon information and belief, the original goal of American Driveline was to merge

Cottman and AAMCO as one complete car care company operating under the brand

name of AAMCO.  After attempting to transfer all Cottman franchises to AAMCO and

meeting some resistance, American Driveline ceased forcing Cottman franchisees to

change to AAMCO and currently holds two distinct entities operating in competition with

each other under ADS.

31.     Since its inception, AAMCO has published UFOC/FDDs that make false representations,

omissions, and present an illusory franchise system to prospective franchisees.  Their

goal is to coerce prospective franchisees to invest in an AAMCO franchise.

32.     AAMCO transmitted by interstate wire and/or through the U.S. mail fraudulent

UFOC/FDDs to numerous prospective and actual franchisees for the purpose of

fraudulently inducing them to invest in an AAMCO franchise.

33. AAMCO transmitted by World Wide Web/Internet to numerous prospective and actual franchisees fraudulent and deceptive information for the purpose of fraudulently inducing them to invest in an AAMCO franchise.

34. AAMCO transmitted franchise registration material to governmental agencies in several States that require Franchisors to register.  Each of those items contained material fraudulent misrepresentations and omissions.

35. AAMCO transmitted by interstate wire a newsletter entitled "Twinpost" which contained fraudulent information intended to mislead the current franchisees as to the health of the system.

### The Franchisee Lure

36. AAMCO starts luring investors to its door through the use of interstate wires by way of its Internet Website.  AAMCO's internet website misrepresents, "With AAMCO, you're never short on support.  Once your AAMCO store is up and running, that doesn't mean your support slows down. Our ongoing operational and technical support is designed to help you avoid costly mistakes. By the same token, we will guide you through any rough spots you do encounter."

37. AAMCO through their website misrepresents that AAMCO has over 800 locations nationwide, which leads a franchisee to believe they are a part of a much larger and stronger system than they really are.

38.  AAMCO also lures investors to its doors with potential profit and earnings claims along with promises to provide:

      a.     Financing for qualified candidates

      b.     Real estate support

  c. Opening support and GOOD training

  d. Corporate training

  e. Recruiting support

  f. Operational support

  g. Technical support

  h. Traditional and online marketing

  i. Customer loyalty and retention

  j. National fleet accounts

  k. National purchasing program

  l. Recession resistant business; and

  m. Reasonable business hours

39. AAMCO further boasts that the investor does not need any automotive experience, and in some cases allows for franchisees to be absentee owners.

40. AAMCO flaunts itself as the world's largest franchise system of transmission specialists. A continued rapid increase in the number of AAMCO franchises sold is an important element in AAMCO's strategy of continuing to experience substantial growth in revenues.

41. AAMCO then reels the new franchisees into unconscionable and burdensome franchise agreements.  It engages in a policy whereby it accepts substantial payments from potential franchisees, in exchange for the right to operate an AAMCO franchise that AAMCO knows or should reasonably know will, in all likelihood, fail.

42. At the same time, AAMCO was inducing Plaintiffs and other to invest in its franchise system, it concealed the fact that the company was unable to support the system.

43.     AAMCO's misleading and deceptive franchise agreements purport, among many other things, to give AAMCO unilateral control over all significant aspects of franchisee operations and to disclaim any responsibility for the effect of AAMCO's decisions and actions on the franchisees' viability.

44.     The franchisee quickly discovers in training that the AAMCO system represented to them was not the AAMCO system provided to them.

45.     Unfortunately, by the time the franchisee realizes this, he or she is already ensnared in the AAMCO net.

46.     AAMCO creates an environment where franchisees and their invested capital are preyed upon as the most important, immediate, and dependable source of revenue and cash flow for the Franchisor, with little concern demonstrated by the Franchisor regarding the franchisees' net profit.

47.     Defendants engaged in the practice of churning franchisees.

48.     The term "churning" refers to a practice in which the Franchisor does not comply with its obligations under the Franchise Agreement while making it financially impossible for the Franchisee to comply with certain conditions of the franchise agreement.  For example, because of the misrepresentation of the system many franchisees are unable to pay royalty payments or loan payments to the Franchisor and still operate their Franchise at a loss.   Once that occurs, Franchisor can remove an existing Franchisee from a location and place a new Franchisee in that location.  The same scheme is used with the new Franchisee and the cycle continues.  The scheme allows the Franchisor to sell as many franchises as it can in order to increase its revenue stream.

49.     As soon as a franchisee begins to struggle and starts looking to get out of the AAMCO

net, AAMCO swoops in and threatens the franchisee with legal action and conveniently

offers to "help" the franchisee out by selling his location.

50.     AAMCO then uses Take Over Specialists, also known as "Floaters," 1099 independent

contractors hired by the franchisor, to go to the struggling franchise location and increase

sales revenues so that the franchise location can be sold to another new franchisee.  The

Floater operates the location strictly by the script given to him by AAMCO.  The script

involved using fraudulent methods to increase sales revenues.  The Floater is

compensated by AAMCO and also given an incentive bonus of 10% of any sales price

when the location is sold.

51.     By using this system, AAMCO avoids having to disclose franchise failures.  In addition,

AAMCO uses the sale as an opportunity to bind the seller to an unconscionable

Settlement and Release Agreement in which, as a condition of the sale being approved,

the seller must waive all rights to make claims against the franchisor under any

circumstances.

52.     By using this scheme, AAMCO has fraudulently induced most struggling Franchisees

into Settlement and Release Agreements in order to be relieved of the threat of future

financial liability to AAMCO.

53.     Moreover, once the franchisees become aware of this fraudulent scheme, the already-

expended costs, onerous contractual provisions, and the fear of retaliation make it

difficult, if not impossible, for the franchisee to bring an individual case against

AAMCO, thus finding themselves robbed blind and in financial ruin.

## Defendant's Admissions of Fraud

### a.      2013 FDD

54.    Under the FTC regulations a franchisor is required to revise its Franchise Disclosure Document within 120 days of their fiscal year.  The fiscal year of AAMCO ends on December 31st of each year.

55.    In March 2013, the Board of Directors of American Driveline met to discuss the upcoming release of AAMCO's 2013 FDD.

56.    At that time, the Board determined that the manner in which AAMCO realized a loss from uncollectible accounts receivable and notes receivable were evaluated and revised.

57.    The Board revised AAMCO's method of taking a loss from uncollectable account receivable and notes receivable by finally admitting the appalling rate of franchisee failures in its system.  At the same time the Board of Directors terminated the services of Defendants GRAHAM and SUMSKY.

58.    The 2013 AAMCO FDD was finally release in November 2013, seven (7) months after Defendant was required to issue its revised FDD.

59.    Attached to the 2013 FDD were audited financials for the year 2012.  Those financials released on November 2013, also included restatements of the financials for 2010 and 2011.  (See Plaintiff's Exhibit 1)

60.    The 2012 audited financials revealed a net loss in excess of twelve (12) million dollars, the majority of which was the reclassification of the collectability of their accounts receivable and notes receivable.  The 2012 audited financials also revealed uncollectible accounts receivable and notes receivable of 74.98%.  The uncollectible accounts receivable and notes receivable for 2010 were originally disclosed as 18.13% and were

corrected to 56.91%.  The uncollectible accounts receivable and notes receivable for 2011 were originally disclosed as 21.64% and were corrected to 63.57%.

61.     This is an absolute admission by Defendants that the vitality of the AAMCO system had been misrepresented to prospective franchisees.

### b.     April 2014 Webinar

62.     On April 28, 2014 a webinar was presented by all of the senior executives of AAMCO and Defendant GANJEI to the current franchisees.  The purpose of the webinar was to announce the drastic reorganization of the AAMCO franchise operations.  (See Plaintiffs Exhibit 2).

63.     In the webinar AAMCO admitted that it was not providing any support to 85% of the franchisees.  The other 15% were getting only short-term support and not a proactive sustainable action plan.

64.     AAMCO developed a new approach that allows for quality, focused visits with heavy support of action plans.

65.     Even though AAMCO represented through use of mail and wires that it would and was providing support, this webinar is clear on AAMCO fraudulent scheme with respect to this misrepresentations.

### PLAINTIFFS' STORIES

66.     The following Plaintiffs stories are set forth in detail in order to expose the fraud which permeates the AAMCO franchise system and as further evidence of the predicate acts of RICO alleged in this complaint.

### THOMAS W. FURLONG'S STORY

67.  Thomas W. Furlong, Jr. is victim of AAMCO's fraudulent scheme.

68.  Prior to his investment in AAMCO, Plaintiff Furlong was extremely successful in management and sales at Hewlett Packard for over thirty years.  Plaintiff was a saavy businessman looking for a sustainable investment for himself and his family.

69.  Furlong researched AAMCO via its internet website prior to signing his franchise agreement.  After researching AAMCO online, Mr. Furlong was comfortable with the representations being made by AAMCO as to the nature of the business.

70.  Plaintiff received his FDD through the mail December 2008.  After researching AAMCO's FDD, Plaintiff was comfortable with the representations being made by AAMCO as to the nature, strength, and vitality of the business.

71.  Once AAMCO became aware of Mr. Furlong's interest, it aggressively pursued him as a franchisee.  Various representatives of AAMCO, including Barry Auchenbach, LEFF, Jack Bachinsky, John Conway and others, made several claims to Plaintiff including but not limited to, that AAMCO provided a solid support system and a proven system that would permit Plaintiff to draw a "comfortable" salary of $50,000 or more per year, that his break-even point was $16,000 per week, understated operating expenses, and more.

72.  After signing the franchise agreement on January 26, 2009, he received among many other things, insufficient training, several excessive fees, none of the promised support, no promised fleet accounts, and more.

73.  In fact, Plaintiff left training with virtually nothing more than a memorized script and left to fend for himself.

74.  In addition, AAMCO stole away one of Plaintiff's employees, a prized rebuilder, for their use.

75.  Furthermore, prior to his purchase, Plaintiff was never informed by AAMCO that the Belair, MD location was for sale.  AAMCO did not want Plaintiff Furlong to purchase an existing shop as it would limit the amount of money AAMCO would make off the sale, as a new purchase required Plaintiff Furlong to buy everything including the equipment, all of which AAMCO received kickbacks for.

76.  Plaintiff Furlong found out that the Belair, MD location was for sale at an ad pool meeting when the owner of that location asked him why he hadn't been interested in purchasing his location.  Plaintiff Furlong told the owner that AAMCO never told him and had he known he would have been very interested.

77.  Due to lack of knowledge of the Belair location, Plaintiff had to spend an extensive amount more to open a new AAMCO franchise, enter into a longer, badly negotiated lease, state a new clientele, and travel 45 minutes each way daily to his shop when he could have been driving half that time to the Belair location.

78.  He was forced to close his franchise on or about January of 2012.

79.  As soon as Plaintiff was "in the door," he quickly realized he was on his own and that several of the representations he had relied upon in making his decision to purchase his franchises were false.

80.  In addition, Plaintiff discovered that several material facts known by Defendants were not disclosed to Plaintiff prior to him executing the franchise agreements.  These materials facts include, but are not limited to, the following:

    a.  The difficulty of finding employees and transmission rebuilders

    b.  The high risk of theft

    c.  The high rate of franchisee failures

    d.  Lack of support

    e.  The relationship and conspiracy between Defendant AAMCO and Defendant GANJEI

81.  Plaintiff reached out to AAMCO many times for the support he was promised and was led to believe that he would receive.  Instead of giving him the support he requested and was promised, AAMCO sent in a floater, Mark Testa, to attempt to discredit Plaintiff by fraudulently inflating the sales numbers while the profit loss remained the same.

82.  The floater did many things to increase the revenue but actually cut the profit and left in his wake several additional problems that Plaintiff was forced to resolve.

83.  The floater was able to raise the revenue by, including but not limited to, cutting the cost of repairs to customers dramatically, promising financing to consumers when work was completed, and giving parts/services away to consumer who purchased another part/service.

84.  Overall, Plaintiff has not received the support and assistance as promised by AAMCO and the system he actually purchased was far different than the system that was represented to him prior to the execution of his franchise agreements.

85.  After notifying AAMCO that he had no option but to close, AAMCO, once again, threatened the Plaintiff Furlong with legal action if he closed but did offer to "help" by sending in a floater by the name of Mark Testa to run up his sales numbers and resell his franchise to another investor.

86.  In the same meeting with GRAHAM and O'DONELL where he signed the final documents to sell his franchise, Plaintiff was offered a job with AAMCO.

87.     O'DONELL asked Plaintiff to go to struggling and/or closed AAMCO franchise

locations and prepare the building to be resold.  Plaintiff's job duties included many tasks

related to preparing the building for a "turnkey" resale, including but not limited to,

painting the center, ensuring the correct signage was installed, ordering the needed

equipment, and making sure the proper operating system was in place.

88.     In a need for a job/income, Plaintiff agreed to take the position as a 1099 independent

contractor until he ceased working for AAMCO in late 2012.

89.     As a direct and proximate result of the fraudulent scheme of Defendant's through the use

of internet wire and mail communications, Plaintiff has sustained damages in excess of

$600,000.00.

## GUSTAVO SOTO'S STORY

90.     Gustavo Soto is another victim of AAMCO's fraudulent scheme.

91.     Prior to his investment in AAMCO, Plaintiff Soto was extremely successful as an airline

pilot for Jet Blue for over thirty years.  Plaintiff was a business man looking for a

sustainable investment for himself and his family.

92.     Soto researched AAMCO via its internet website prior to signing his franchise

agreement.  After researching AAMCO online, Mr. Soto was comfortable with the

representations being made by AAMCO as to the nature of the business.

93.     Plaintiff received his FDD through the mail in December 2006.  After researching

AAMCO's FDD, Plaintiff was comfortable with the representations being made by

AAMCO as to the nature, strength, and vitality of the business.

94.     Once AAMCO became aware of Mr. Soto's interest, it aggressively pursued him as a

franchisee.  Various representatives of AAMCO, including Barry Auchenbach, Doug

Boarman, Barbara McQuisten, John Conway, Pat Drinkwater, Mike Bura, and others, made several claims to Plaintiff including but not limited to, that AAMCO provided a solid support system and a proven system, that Plaintiff could draw a "comfortable" salary of $80,000 to $120,000.00 per year, his startup capital should be $30,000, that he should expect to breakeven within six (6) months, and more.

95.   After signing the franchise agreement on January 2007, he received among many other things, insufficient training, several excessive fees, and none of the promised support.  He was forced to close his franchise on or about January 4, 2013.  Plaintiff was forced into a bankruptcy due to the massive debt he was in after being forced to close.

96.   As soon as Plaintiff was "in the door," he quickly realized he was on his own and that several of the representations he had relied upon in making his decision to purchase his franchises were false.

97.   Plaintiff Soto originally desired to open his franchise in Colorado Springs, Colorado.

98.   Defendant, AAMCO did a demographic study and advised Plaintiff that he should not open in Colorado Springs, but rather should open the location in Fountain, Colorado.

99.   Plaintiff was told that Fountain, Colorado was the perfect location and that people would line up to work for him.

100.   It took over a year for Plaintiff to receive a location to open his AAMCO franchise.

101.   In addition, Plaintiff discovered that several material facts known by Defendants were not disclosed to Plaintiff prior to him executing the franchise agreements.  These materials facts include, but are not limited to, the following:

    a.   The difficulty of finding employees and transmission rebuilders

    b.   The high risk of theft

    c.   The high rate of franchisee failures

    d.   Lack of support

    e.   The relationship and conspiracy between Defendant AAMCO and Defendant GANJEI

102.   Plaintiff reached out to AAMCO many times for the support he was promised and was led to believe that he would receive.  Instead of giving him the support he requested and was promised, AAMCO sent in a floater to attempt to discredit Plaintiff by fraudulently inflating the sales numbers while the profit loss remained the same.

103.   In addition, AAMCO even took one of Plaintiff's managers for their personal use and left Plaintiff struggling to find another one.

104.   During his time as an AAMCO franchisee, Plaintiff was charged undisclosed and excessive fees with no accounting, encouraged to use deceptive practices on the consumer, never received the promised fleet accounts, required to pay for inadequate and unprofessional advertising, and more.

105.   In fact, Plaintiff brought several issues and problems to AAMCO's attention only to receive no response or assistance.  For example, every year, DAC Advertising, which is the company AAMCO required Plaintiff to use, messed up Plaintiff's advertising and cost him money.  AAMCO did nothing to resolve the issues which included Plaintiff being left out of specific sections of the telephone book, constant internet issues, and Google Local issues.

106.   As if AAMCO hadn't caused enough damage, AAMCO came onto his property and took signage off of his building without his permission.  Plaintiff Soto paid for and owned the

signs and building.  Plaintiff demanded that they be returned and reinstalled but never received a response.

107.    As a direct and proximate result of the fraudulent scheme of Defendant's through the use of interstate wire and mail communications, Plaintiff has sustained damages in excess of $600,000.00..  Plaintiff was also forced into bankruptcy as a result of the fraudulent scheme of Defendant's through the use of interstate wire and mail communications.

## THE FTC RULE

108.    Promulgated on December 21, 1978, the FTC Rule is designed to require sellers of franchises like AAMCO TRANSMISSIONS, INC. to provide prospective investors with the information they need to make an informed investment decision.  The FTC Rule, found at 16 CFR Part 436,  permits Franchisors to use a uniform disclosure format which has been adopted by every state known as the "Franchise Disclosure Document" ("FDD"), formerly known as the "Uniform Franchise Offering Circular" ("UFOC"). Each topic of disclosure in the FDD is referred to as an "Item" numbered 1 to 23.  Some of the most basic Items are the following:

### FTC VIOLATIONS OF AAMCO

#### Item 1

109.    Item 1 requires, *inter alia*, disclosure of the prior business experience of the franchisor and any predecessors or affiliates.  As far as affiliates, the franchisor is required to disclose the identity of any affiliates that offer franchises in any line of business or provide products or services to the franchisees of the franchisor.

110.    AAMCO misrepresents and omits matters of material fact in Item 1 of its FDD.

111.    Prior to an investigation and finding by the State of Washington, AAMCO failed to

disclose that AMERICAN DRIVELINE was a parent company.  (See Exhibit 17 , State of Washington v AAMCO)

112.    This misrepresentation was made to every potential franchisee at the time the FDD was forwarded through the mail or by wire.

113.    That failure of AAMCO to properly disclose the information as required in Item 1 is, per se, an unfair and deceptive trade practice.

<u>Item 4</u>

114.    <u>Item 4</u> requires the disclosure of whether the franchisor, any parent, predecessor, affiliate, officer or general partner of franchisor, or any other individual with management responsibility has within a ten year period filed as a debtor or had filed against it  a petition under the United States Bankruptcy Code, obtained a  discharge of its debts under the Bankruptcy Code, or was a principal officer of a company or a general partner in a partnership that either filed as a debtor or had filed against it a petition under the Bankruptcy Code while or within one year after the office or general partner held the position in the company.

115.    AAMCO misrepresents and omits matters of material fact in Item 4 of its FDD.

116.    AAMCO failed to disclose that GRAHAM was the former president of EZ Lube, LLC and that while he was President EZ Lube, LLC filed for bankruptcy in December of 2008. (See Exhibit 18 - State of Virginia v AAMCO Transmissions, Inc.)

117.    These misrepresentations were made to every potential franchisee at the time the FDD was forwarded through the mail or by wire.

118.    The failure of AAMCO to properly disclose the information as required in Item 4 is, per se, an unfair and deceptive trade practice.

<u>Item 20</u>

119. <u>Item 20</u> requires the franchisor to fully disclose information concerning its current and former franchisees, including the number of franchisees whose ownership was transferred or whose franchise was canceled, terminated, or not renewed or have ceased doing business in the system.  A pattern of abandonment, sales, terminations and non-renewals indicates a sick franchise.

120. AAMCO, violated the FTC rule with regard to Item 20 of the FDD in that it failed to disclose that certain franchise locations contained in the FDD were closed, had never opened, or were resold, transferred or otherwise changed ownership.

121. These misrepresentations were made to every potential franchisee at the time the FDD was forwarded through the mail or by wire.

122. The aforesaid misrepresentations were made for the sole purpose of preventing potential franchisees from contacting dissatisfied former franchisees.

123. The failure of AAMCO to accurately relay the information as required in Item 20 is, per se, an unfair and deceptive practice.

<u>Item 21</u>

124. <u>Item 21</u> requires the franchisor and its subsidiaries to include audited financials according to United States Generally Accepted Accounting Principles.

125. AAMCO has violated the FTC Rule with regards to Item 21 of the FDD in that it has provided consolidated financial statements which contain statements of income and expenses which are inaccurate, false, and misrepresent the true financial condition of the franchisor.

126. These misrepresentations were made to every potential franchisee at the time the FDD

was forwarded through the mail or by wire.

127.   Filing consolidated financial statements which contain inaccurate and/or fraudulent

information is, per se, an unlawful and deceptive trade practice.

The Timing of Federal Disclosure

128.   In addition to providing a format for disclosures, the FTC Rule specifies when a

disclosure document must be given to the prospective franchisee.  Such timing

requirements are intended to ensure that franchisees have a "cooling off" period in which

to evaluate the disclosure document before paying any monies to the franchisor and

before executing agreements binding on the prospective franchisee.

129.   Under the Rule, the prospective franchisee must be provided a disclosure document upon

the *earliest* to occur of any of the following three events:

a.     The first face to face meeting with a franchisee;

b.     10 business days prior to the execution of a franchise agreement; or

c.     10 business days prior to payment by a prospective franchisee.

130.   Violations of the FTC Rule are considered unfair or deceptive acts within the meaning of

Subpart F of the Federal Trade Commission Act, 16 CFR Section 436.9.

JURISDICTION AND VENUE

131.   This Court has subject matter jurisdiction over this case pursuant to 18 U.S.C. § 1964(c)

under the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO") claim.

132.   This court has subject matter jurisdiction over the Plaintiffs' claim brought under RICO

pursuant to 28 U.S.C. § 1331.

133.   Venue is proper in this Court under 28 U.S.C. § 1391 (b) (2) because a substantial part of

the events or omissions giving rise to the claims of the Plaintiffs occurred in this judicial

district: ATI operates and does business in the Southern District of Illinois through franchisees.  A substantial part of the events giving rise to Plaintiffs' claims occurred in the Southern District of Illinois.

134.    Venue is also proper pursuant to the nationwide service of process and venue provisions under 18 U.S.C. § 1965.

<u>CLASS ACTION ALLEGATIONS</u>

135.    This action may also properly be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b).

136.    Plaintiffs bring this action on behalf of themselves and all similarly situated others defined as:

*All AAMCO Transmissions, Inc. franchisees, who signed a franchise agreement with AAMCO Transmissions, Inc. and its predecessors, at any time prior to January 1, 2007 and were still franchisees as of January 1, 2007 and/or all AAMCO Transmissions, Inc. franchisees who signed a franchise agreement any time after January 1st, 2007  to the present (the "Class"). The "Class Period" is from January 1, 2007 to the present. Excluded from the Class are Defendants, as well as Defendants' employees, affiliates, officers, and directors and the Judge to whom this case is ultimately assigned.*

137.    Plaintiffs reserve the right to amend the definition of the Class if discovery and/or further investigation reveal that the Class should be expanded or otherwise modified.

<u>Rule 23(a)</u>

138.    <u>Numerosity and Impracticality of Joinder</u>: The members of the Class are so numerous that their individual joinder would be impractical. According to the 2012 FDD (Exhibit 19, Item 20) there were at least 773 current franchisees in their system at the end of 2011.

The precise identities, number and address of members of the Class are unknown to Plaintiffs, but may and should be known with proper and full discovery of Defendants, third parties, and their respective records.

139. <u>Commonality and Predominance</u>: There is a well-defined commonality of interest and common questions of law and fact that predominate over any questions affecting individual members of the Class. These common legal and factual questions, which exist without regard to the individual circumstances of any Class member, include, but are not limited to, the following:

    a.     Whether and to what extent Defendants' practices, conducts, and misrepresentations violate Federal law;

    b.     Whether Defendants have engaged in mail and wire fraud;

    c.     Whether it was reasonably foreseeable that misrepresentations by AAMCO would be sent over interstate wires or mails;

    d.     Whether there were any misrepresentations by AAMCO sent across interstate wires and mails for purposes of executing schemes to defraud;

    e.     Whether AAMCO intentionally participates in schemes to defraud and use interstate wires in furtherance of the scheme in violation of 18 U.S.C. § 1343;

    f.     Whether Defendants engaged in a pattern of racketeering activity;

    g.     Whether the AAMCO franchise system is an enterprise within the meaning of 18 U.S.C. §1961(4);

h.      Whether Defendants conducted or participated in the affairs of the enterprise through a pattern of racketeering activity in violation of U.S.C. § 1962(c);

i.      Whether Defendants' overt and/or predicate acts in furtherance of the conspiracy and/or direct acts in violation of 18 U.S.C. §1962(a) and (c) proximately caused injury to the Plaintiffs' and class members' business, economic, and property;

j.      Whether Defendants' affirmative statements and material omissions constitute intentional fraud;

k.      Whether AAMCO's FDD contained fraudulent misrepresentations and omissions;

l.      Whether Plaintiffs and Class Members are entitled to recover compensatory, exemplary, treble damages based on Defendants' fraudulent and illegal conduct and/or practices; and

m.      Whether Plaintiffs and Class Members are entitled to an award of reasonable attorneys' fees, prejudgment interest, and costs of suit.

The questions or law and fact common to all Class members predominate over any questions that may affect only individual Class members. A class action is a superior method of adjudicating the Class members' claims because individual actions would unnecessarily burden the Court and create the risk of inconsistent results.

140.    Typicality: The Plaintiffs' claims are typical of the Class in that Plaintiffs have a common origin and share common bases.  Plaintiffs and all putative Class members are or were franchisees operating under the AAMCO system and have lost monies by reason of the

system-wide scheme by AAMCO to defraud and make misrepresentations to potential franchisees of the AAMCO system.   Their claims originate from the same illegal, fraudulent and confiscatory practices of the Defendants, and the Defendants act in the same way toward the Plaintiffs and the Class members.  If brought and prosecuted individually, the claims of each Class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.  Plaintiffs have no interests that are antagonistic or adverse to the other Class members.

141.  Adequacy: Plaintiffs will fully and adequately protect the interests of the members of the Class and have retained competent class counsel who are experienced and qualified in prosecuting class actions and other forms of complex litigation and intend to prosecute this action vigorously. Neither the Plaintiffs nor their counsel have interests which are contrary to, or conflicting with, those interests of the Class.

142.  Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, *inter alia*: it is economically impracticable for members of the Class to prosecute individual actions; prosecution as a class action will eliminate the possibility of repetitious and redundant litigation; and, a class action will enable claims to be handled in an orderly, expeditious manner.

143.  Plaintiffs seek certification of a class, alternatively, under Fed. R. Civ. P.23(b)(2) or 23(b)(3), or a combination thereof.

144.  This lawsuit may be maintained as a class action under Federal Rules of Civil Procedure 23(b)(3) because questions of fact and law common to the Class predominate over the questions affecting only individual members of the Class, and a class action is superior to

other available means for the fair and efficient adjudication of this dispute..  The damages suffered by each individual class member may be disproportionate to the burden and expense of individual prosecution of complex and extensive litigation to proscribe Defendants' conduct and practices.  Additionally, effective redress for each and every class member against Defendants may be limited or even impossible where serial, duplicated or concurrent litigation occurs arising from these disputes.  Even if individual class member could afford or justify the prosecution of their separate claims, such an approach would compound the judicial inefficiencies, and could lead to incongruous judgments against Defendants.

## **Statute of Limitations Estoppel**

145.  Throughout the implementation of their fraud and continuing until the present day, Defendants have engaged in affirmative conduct and made representations, including those described herein, with the intent and effect of preventing Plaintiffs and the Class from becoming aware of their rights or otherwise dissuading them from pursuing legal action to vindicate those rights.

146.  Defendants have also actively concealed information necessary for Plaintiffs and the Class to discover the existence of their cause of action.

147.  As a result of Defendants' self-concealing fraud, affirmative misconduct, misrepresentations and omissions, Plaintiffs and the Class did not know, and could not know in the exercise of reasonable diligence, the basis of their claims.  Accordingly, Defendants are estopped from raising affirmatively defenses relying upon any statutes of limitations or contractual limitation periods otherwise applicable to the claims asserted herein by Plaintiffs.

## COUNT I

**Racketeer Influenced and Corrupt Organizations Act (RICO)**

**Violation of 18 U.S.C. §1962(b)**

Come now Plaintiffs, individually and on behalf of all others similarly situated, and for their cause of action against Defendants state as follows:

148. Plaintiffs re-allege and incorporate by reference as if fully set forth herein, each and every allegation contained in paragraphs 1-147 of this Complaint.

149. ATI, ADS, and ADC have violated the civil provisions of the RICO Statue as described below.

150. Under 18 U.S.C. § 1964(c) "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorneys' fee…"

151. Under 18 U.S.C. § 1961(3) a "person" for the purposes of the Civil RICO Statute is defined as "any individual or entity capable of holding a legal or beneficial interest in a property."

152. Under 18 U.S.C. § 1961(4) the term "enterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

153. ATI is a "person" within the meaning of the RICO Statute.  The association of ATI, ADS, and ADC constitute an "enterprise."

154. Under 18 U.S.C. § 1962(b) [I]t is unlawful to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which engages in or affects interstate or

foreign commerce through a pattern of racketeering activity or collection of any unlawful debt.

155.    Section 1961(1) of RICO Statute defines "racketeering activity" to include any of the enumerated predicate acts listed in section 1961(1).  The list of predicate acts includes "extortion", "mail fraud", and "wire fraud."

156.    Under 18 U.S.C. § 1951(b)(2) the term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

157.    Under 18 U.S.C. § 1341 the term "mail fraud" is defined as whoever, having devised or intending to device any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises…for the purposes of executing such a scheme of artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing...

158.    Under 18 U.S.C. § 1343 the term "wire fraud" is defined as whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, television, communication in interstate or foreign commerce, any writings, signs, signals, pictures or sounds for the purpose of

executing such a scheme or artifice…

159. At all times relevant to the claims made herein, AAMCO has acquired and maintained an interest in and control of the enterprise consisting of ATI, and ADS and their collusion together, by engaging in the false, fraudulent, and illegal acts set forth above, which took place in interstate commerce, which constituted acts of extortion, wire fraud, and mail fraud by sending misleading and false franchise disclosure documents and other documents through the mails, making false and fraudulent statements via the telephone and otherwise, and using wrongful threats of economic harm to obtain property from franchisees to which AAMCO was not contractually entitled.

160. The activities of the enterprise of ATI, ADS, and ADC constituted a pattern of racketeering in that the activities were both continuous and related.  The false acts were all intended to induce scores of persons to become franchisees of AAMCO, to coerce individual franchisees to pay AAMCO more money than they were obligated to pay under their franchise agreements, and to acquire title to certain failed franchises. Defendants induced many persons to become franchisees under franchise agreements pursuant to which they would continue to pay AAMCO for many years and the scheme threatens to continue.

161. Plaintiffs have been injured in their business and property as a result of Defendants' violations of 18 U.S.C. § 1962(b).  Specifically, Plaintiffs have been deprived of the amounts they paid to AAMCO pursuant to the franchise agreements and for additional amounts.  As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(b), Plaintiffs have suffered damages in an amount undetermined at this time but in excess of $75,000.

WHEREFORE, for the foregoing reasons, Plaintiffs, individually and on behalf of all others similarly situated, pray this Court enter judgment in their favor in Count I of their Complaint, treble damages, an award of attorneys' fees, their costs herein expended, and for such other relief the court deems just and proper.  Plaintiffs hereby demand trial of their claims by jury to the extent authorized by law.

## COUNT II

**Racketeer Influenced and Corrupt Organizations Act (RICO)**

**Violation of 18 U.S.C. §1962(c)**

Come now Plaintiffs, individually and on behalf of all others similarly situated, and for their cause of action against Defendants state as follows:

162.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein, each and every allegation contained in paragraphs 1- 161 of this Complaint.

163.    Under 18 U.S.C. § 1962 (c) it is unlawful for any person to conduct or participate in the conduct of the affairs of an enterprise that is engaged in or affects interstate or foreign commerce through a pattern of racketeering activity or collection of unlawful debt.

164.    The AAMCO system constitutes an association-in-fact enterprise under 18 U.S.C. §1961(4) in that: (a)  there is a common and/or shared purpose among the members; (b) there is continuity of structure and personnel; and (c) there is an ascertainable structure distinct from that inherent in the pattern of racketeering.

165.    The enterprise is separate and distinct from the individual Defendants that participated in the enterprise and direct its affairs.

166.    The structure of the enterprise is imposed by the Franchise Agreements.

167.    There are aspects of the operation of this enterprise that do not involve conduct that is

intrinsically criminal or illegal.

168.    The enterprise affects interstate commerce in a variety of ways including the use of interstate communications to defraud, deceive and threaten Plaintiffs and affect interstate commerce in that the amounts received by AAMCO were based on the sale and purchase of items that crossed state lines.

169.    The Defendants conduct the affairs of the enterprise, as opposed to merely their own affairs by, among other things, fraudulently inducing Plaintiffs to enter into franchise agreements.

170.    Defendants, including each and every individual Defendant, participated in the conduct of the enterprise through inducing the purchase of franchises by Plaintiffs and all members of the Class, by knowingly disseminating false and fraudulent information contained within the franchise disclosure documents, the franchise agreements and other publicly available resources.

171.    Defendants are engaged in an ongoing pattern of racketeering activity as defined by 18 U.S.C. §1961(5).

172.    The pattern of racketeering activity of Defendants consists of more than two acts of racketeering activity, the most recent of which occurred within ten years after the commission of the prior act of racketeering activity.

173.    Defendants have violated and continue to violate 18 U.S.C. §1341 in that defendants: (a) devised a plan to scheme or defraud the franchisees; (b) intended to defraud franchisees, (c) should have reasonably foreseen that the mail would be used; and (4) used the U.S. Postal Service or equivalent private carrier to further the scheme.

174.    Defendants have violated and continue to violate 18 U.S.C. §1343 in that defendants: (a)

devised a plan to scheme or defraud the franchisees; (b) intended to defraud franchisees, (c) should have reasonably foreseen that wires would be used; and (4) used wires to further the scheme.

175.   Each violation of 18 U.S.C §1341 and §1343 constitutes an act of racketeering.

176.   The acts of racketeering activity of all Defendants have the same or similar methods.

177.   The acts of racketeering activity committed by all Defendants have the same or similar objective: namely to sell as many franchises as possible to increase the profits of the Defendants.

178.   The acts of racketeering activity committed by all Defendants have the same victims, including Plaintiffs and all other Class Members.

179.   The acts of racketeering activity involving all Defendants involve a distinct threat of long-term racketeering activity.

180.   The practice of Defendants in knowingly and intentionally misrepresenting the true nature of AAMCO system has continued for at least twenty years, is ongoing, and will continue into the future unless halted by judicial intervention.

181.   Defendants' intentional misrepresentation of the true nature of the AAMCO system is part of the enterprise's regular way of conducting business.

182.   Defendants' pattern of racketeering activity has caused Plaintiffs and all other Members of the Class to invest into a system much different than the system represented to them by Defendants.

183.   Plaintiffs and all other Class Members have suffered an injury to their business and/or property in that as a result of Defendants' violations of 18 U.S.C § 1962(c) in that Plaintiffs/Class Members were fraudulently induced into entering Franchise Agreements

as a result of Defendants racketeering activity.

184. The unlawful conduct of all Defendants has allowed defendants to earn and/or retain significant funds to which they are not entitled, including the amounts paid to AAMCO pursuant to the franchise agreements and for additional amounts.

185. As a direct and proximate result of AAMCO's violations of 18 U.S.C. 1962(c), Plaintiffs have suffered damages in an amount undetermined at this time but in excess of $75,000.

WHEREFORE, for the foregoing reasons, Plaintiffs, individually and on behalf of all others similarly situated, pray this Court enter judgment in their favor in Count II of their Complaint, treble damages, an award of attorneys' fees, their costs herein expended, and for such other relief the court deems just and proper. Plaintiffs hereby demand trial of their claims by jury to the extent authorized by law.

## COUNT III

### Racketeer Influenced and Corrupt Organizations Act (RICO)

### Violation of 18 U.S.C. §1962(d)

Come now Plaintiffs, individually and on behalf of all others similarly situated, and for their cause of action against Defendants state as follows:

186. Plaintiffs re-allege and incorporate by reference as if fully set forth herein, each and every allegation contained in paragraphs 1- 185 of this Complaint.

187. Under 18 U.S.C. § 1962(d) it is unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

188. As set forth in Count I and Count II, Defendants agreed and conspired to violate 18 U.S.C. §1962(d). Specifically, Defendants engaged in a willful pattern and practice of misrepresenting the AAMCO system in order to fraudulently induce Plaintiffs and

Members of the Class into entering Franchise Agreements.

189.   The Defendants have intentionally conspired to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

190.   Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes aforementioned schemes in violation of 18 U.S.C. §1962(d).

191.   As a direct and proximate result of the Defendants conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. §1962(d), Plaintiffs and Members of the Class have been injured in their business and property in that Plaintiffs were fraudulently induced into entering Franchise Agreements as a result of Defendants racketeering activity.

192.   Specifically, Plaintiffs have been deprived of the amount of money that AAMCO has obtained unlawfully by reason of the conspiracy.

193.   As a direct and proximate result of AAMCO's violations of 18 U.S.C. § 1962(d), Plaintiffs have suffered damages in an amount undetermined at this time but in excess of $75,000.

WHEREFORE, for the foregoing reasons, Plaintiffs, individually and on behalf of all others similarly situated, pray this Court enter judgment in their favor in Count III of their Complaint, treble damages, an award of attorneys' fees, their costs herein expended, and for such other relief the court deems just and proper.  Plaintiffs hereby demand trial of their claims by jury to the extent authorized by law.

Respectfully submitted,

LAW OFFICE OF JONATHAN E. FORTMAN, LLC

By        _____/s/_____

        Jonathan E. Fortman #40319
        Attorney for Plaintiffs/Putative Class Members
        Lead Counsel
        250 Saint Catherine Street
        Florissant, MO  63031
        (314) 522-2312
        (314) 524-1519 Fax
        jef@fortmanlaw.com


        and

        THE WILLMANN LAW FIRM, LC:



By  _____/s/_____
        Benjamin J. Willmann
        Attorney for Plaintiffs/Putative Class Members
        7733 Forsyth Blvd., Suite 1100
        Clayton, Missouri  63105
        (314)727-6900
        (314)296-6001 Fax
        Willmannlaw@gmail.com